**CURTIS–UNIVERSAL, INCORPORATED, Plaintiff,**

**v.**

**SHEBOYGAN EMERGENCY MEDICAL SERVICES, INCORPORATED, doing business as Orange Cross; et al., Defendants.**

**FIRST NATIONAL INSURANCE COMPANY OF AMERICA, Intervening Plaintiff–Appellee,**

**v.**

**SHEBOYGAN EMERGENCY MEDICAL SERVICES, INCORPORATED, doing business as Orange Cross, Defendant–Appellant.**

No. 94–1858.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 3, 1994.

Decided Dec. 14, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 12, 1995.

K. Scott Wagner, Hale & Lein, Milwaukee, WI, for Curtis–Universal, Inc.

Craig W. Nelson (argued), Nelson, Dries & Zimmerman, Brookfield, WI, for First Nat. Ins. Co. of America.

Michael Fischer, James T. McKeown (argued), Foley & Lardner, Milwaukee, WI, for Sheboygan Emergency Medical Services, Inc.

Before POSNER, Chief Judge, and CUMMINGS and ENGEL,* Circuit Judges.

POSNER, Chief Judge.

■ We are asked to decide whether an insurance company (First National Insurance Company of America) that has promised to indemnify its insured for liability resulting from the infliction of "advertising injury" has a duty under the law of Wisconsin to defend the insured against a wide-ranging antitrust and tort suit. The district judge held that there was no duty and granted a declaratory judgment to that effect to the insurance com-

* Hon. Albert J. Engel of the Sixth Circuit.

pany, which had intervened in the suit. 844 F.Supp. 492 (E.D.Wis.1994). The insured—an ambulance service in Sheboygan, Wisconsin that does business under the name "Orange Cross"—has appealed. The appeal is proper because, although litigation remains pending in the district court, the judge's order completely disposes of one party (First National) and the judge entered the order as a final judgment under Fed.R.Civ.P. 54(b).

Together with the two hospitals that own it, Orange Cross has been sued in an 86–paragraph complaint by a competing ambulance service, Curtis–Universal. The complaint charges the defendants with conspiring to exclude Curtis from the Sheboygan market in ambulance service, in violation of federal antitrust law and state tort law. The City of Sheboygan had decided to privatize its emergency ambulance service ("911 service"). To this end it invited bids for the provision of the service on a contract basis. Curtis won the bidding contest, beating Orange Cross, the 911 provider in the surrounding county. Determined to reverse the outcome of the contest, Orange Cross and its parent hospitals organized a boycott of Curtis's ambulance service. Patients brought to either hospital in a Curtis ambulance were told, even if they requested that Curtis be used to take them home or to some other destination when their hospital stay was over, that it was the hospital's policy to use only Orange Cross's ambulance service for the transportation of patients. The hospitals refused to stock Curtis's ambulances with medication, equipment, and supplies, threatened to discontinue referrals to nursing homes that used Curtis's service, and sold their services below cost—all in an effort to run Curtis out of the market. The defendants' scheme was successful; Orange Cross obtained a monopoly of ambulance services in Sheboygan. That is the antitrust claim; among the other claims in Curtis's complaint is a claim for tortious interference with contract in which Orange Cross and the other defendants are accused of "disseminating false information about Curtis" and "campaigning to get the public to call 911 and ask for Orange Cross."

■ Needless to say, in reciting the allegations of the complaint we do not vouch for their truth. But it is conceded (and is obvious from the insurance policy itself, as we are about to see) that the insurance company's duty to defend depends on what is alleged in the suit against its insured rather than on the insured's actual conduct. *City of Edgerton v. General Casualty Co.*, 184 Wis.2d 750, 517 N.W.2d 463, 470 (1994).

The insurance policy that First National had issued to Orange Cross is entitled "Broad Form Comprehensive General Liability Endorsement" and promises to indemnify the insured for "all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising injury," and "to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent." The policy defines "advertising injury" as "injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan." There are various exclusions, which we shall take up later.

■ The policy does not cover antitrust injury, but the district judge ruled correctly that if *any* part of the suit would if successful require the insurance company to indemnify the insured for "advertising injury," the insurance company was obligated to defend against the entire suit. *School District of Shorewood v. Wausau Ins. Cos.*, 170 Wis.2d 347, 488 N.W.2d 82, 88 (1992); *Tews Funeral Home, Inc. v. Ohio Casualty Ins. Co.*, 832 F.2d 1037, 1043–44 (7th Cir.1987) (per curiam) (a case similar to ours, but governed by Illinois law); cf. *Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1040 (7th Cir.1992). The judge therefore considered whether the count charging tortious interference might come within the scope of the policy. The insurance company conceded that the injury about which Curtis was complaining in that and the other counts had been inflicted in the course of Orange Cross's "advertising activities," but not that the injury had arisen out of any of the listed torts (libel, slander, etc.) that delimit the policy's coverage of advertising injury. The closest tort listed in the policy was unfair competition, but the district judge held that this term should be narrowly limited to acts of or similar to trademark infringement, and he did not think that the complaint charged such acts.

■ In reaching this conclusion the judge thought it significant that Curtis's complaint did not use the term "unfair competition" and that the complaint as a whole was centered in the antitrust allegations. Neither point is significant. The insurer's obligations are not circumscribed by the plaintiff's choice of legal theories. The plaintiff's complaint, upon which the insurer's duty depends, need not even set forth the plaintiff's legal theories. See, e.g., Fed.R.Civ.P. 8(a); Fed.R.Civ.P. Form 9. What is important is not the legal label that the plaintiff attaches to the defendant's (that is, the insured's) conduct, but whether that conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers. *U.S. Fire Ins. Co. v. Good Humor Corp.*, 173 Wis.2d 804, 496 N.W.2d 730, 734–35 (App.1993); *Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 649 (7th Cir.1990) (applying Wisconsin law). So, for example, if the complaint alleges facts that if proved would show that the insured had infringed the plaintiff's copyright, the policy kicks in even if the complaint charges the insured only with fraud or intentional infliction of emotional distress. *Barber v. Nylund*, 158 Wis.2d 192, 461 N.W.2d 809, 811 (App.1990); *Berg v. Fall*, 138 Wis.2d 115, 405 N.W.2d 701, 704 (App.1987). Nor is the insurer allowed to escape from his duties of defense and indemnification by reference to the core or dominant character of the plaintiff's allegations. That would violate the principle that if any of the conduct alleged in the complaint falls within the scope of the insurance policy, the insurer must defend. If unfair competition within the meaning of the insurance contract is alleged (not necessarily by name), it is irrelevant that it is a subordinate aspect of the plaintiff's case.

So we must decide whether facts alleged in or implied by the claim of tortious interference with the contract between Curtis and the City of Sheboygan constitute "unfair competition" within the meaning of the insurance contract. This may in turn depend on whether the policy should be understood as using "unfair competition" broadly, perhaps in a layman's sense, or whether it must be confined to its core legal meaning. Taken broadly—and even without regard to section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which forbids "unfair methods of competition," a term that has been interpreted to encompass everything forbidden by federal antitrust law and then some, *FTC v. Brown Shoe Co.*, 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966)—"unfair competition" is committed whenever a seller resorts to methods of competition forbidden by law, including antitrust law. Milton Handler, "Unfair Competition," 21 *Ia.L.Rev.* 175 (1936). The broad interpretation cannot be right for the insurance policy in our case. It would turn insurance against liability for "advertising injury" into insurance against liability for antitrust violations, provided only that the violations arose out of the insured's "advertising activities"—and if one may judge from the insurance company's concession that Orange Cross was engaged in advertising activities, this requirement is easily satisfied, perhaps by any firm that conducts marketing activities of any sort in support of its sales. As far as we have been able to determine, insurance companies will not insure against liability for antitrust violations, a liability based on deliberate rather than inadvertent actions, cf. *Harley–Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 343 (7th Cir. 1994), and for this and other reasons impossible to predict by the actuarial methods on which insurance companies base their determination of premiums. Granted, various exclusions in the policy issued to Orange Cross would cut down the insurer's potential liability for antitrust damages; it is common for insurance policies to give with the right hand and then take away with the left. Still, we find it highly implausible to suppose that "unfair competition" in a list of torts otherwise concerned mainly with harmful speech in various forms (defamation, invasion of the right of privacy, copyright infringement) would sweep under the policy a general, albeit only prima facie, liability for antitrust damages.

We think it more likely that "unfair competition" bears its normal legal meaning in the insurance policy that First National issued to Orange Cross. But what is that meaning? Originally, "unfair competition" just meant the infringement of an unregistered trademark. 1 Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 2.01 (Louis Altman ed., 4th ed. 1981 with 1994 supp.). With the enactment in 1946 of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), the term expanded to include other false representations concerning goods. 1A Callmann, *supra*, § 5.04. But that was almost fifty years ago. The insurance policy in our case wasn't written fifty years ago. Issued to Orange Cross in 1988, it tracks the 1981 version of the "Broad Form Comprehensive General Liability Endorsement," an industry-wide form that was altered in 1986—to drop "unfair competition." Terri D. Keville, "Advertising Injury Coverage: An Overview," 65 *S.Cal.L.Rev.* 919, 926–28 (1992). A lot of insurance had been written under the 1981 version, however—judging from this case, it continued to be written even after the 1986 revision—and the cases interpreting the 1981 version are divided on how broadly to read "unfair competition." *Id.* at 929–36.

The criterion for interpreting a term in an insurance policy is how the insured would reasonably have understood it. *Elliott v. Donahue*, 169 Wis.2d 310, 485 N.W.2d 403, 408 (1992); *Kremers–Urban Co. v. American Employers Ins. Co.*, 119 Wis.2d 722, 351 N.W.2d 156, 163 (1984); *Senkier v. Hartford Life & Accident Ins. Co.*, 948 F.2d 1050, 1053 (7th Cir.1991). In the absence of contrary evidence not tendered, we think the natural assumption is that Orange Cross would reasonably have understood the term "unfair competition" to bear its legal meaning as of the time when the policy was issued. It would be odd if an insured had to do legal history to figure out the scope of its insurance coverage. By 1988, if not earlier—for we cite below a 1954 case that interpreted "unfair competition" very broadly—the meaning of the term had expanded to take in

a variety of tortious misconduct by one competitor toward another. Maybe it had expanded to the point of including the tort—expressly charged in Curtis's complaint—of intentional interference with contractual relations. *Frandsen v. Jensen–Sundquist Agency, Inc.*, 802 F.2d 941, 947–48 (7th Cir.1986) (applying Wisconsin law); *Sampson Investments v. Jondex Corp.*, 176 Wis.2d 55, 499 N.W.2d 177, 185 (1993) (separate opinion).

Maybe; no stronger word is possible. Neither case that we have cited is concerned with the classification of the tort of intentional interference with contractual (or other advantageous commercial) relations, and the embryonic *Restatement of Unfair Competition,* though it defines "unfair competition" very broadly, excludes the intentional-interference tort. Tent.Draft No. 1, § 1, p. 3 (1988). We have misgivings, moreover, about interpreting "unfair competition" in the policy as broadly as it might be interpreted in the modern law of business torts. A word sometimes picks up meaning from its neighbors; and *all* the other terms in the list of wrongs insured under the rubric of "advertising injury" concern the misuse of information, as befits the word "advertising." Piracy and the infringement of copyrights, titles (presumably of books, songs, products, services, and so forth), and slogans (advertising and other) are simply different forms of theft (broadly conceived) of information. And defamation involves the use of false information, while invasion of the right of privacy the use of true, though misleading or offensive, information. Libel and slander are the two halves of defamation; why all three terms appear in the list is a mystery, though here the drafting history casts some light: "defamation" was eliminated in the 1986 revision of the standard form apparently on the ground of redundancy. Keville, *supra,* 65 S.Cal.L.Rev. at 927–28.

Tortious interference with contractual relations can involve the misuse of information, as where a workers' compensation carrier misrepresents the medical condition of an employee to his employer, with the result that the employee is fired. *American Surety Co. v. Schottenbauer,* 257 F.2d 6 (8th Cir. 1958); cf. *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 911–12 (7th Cir.1994). But it need not, so that if tortious interference along with everything else that parades under the banner "unfair competition"—such as the misleading imitation of a trade name (in effect trademark infringement), *Spheeris Sporting Goods, Inc. v. Spheeris on Capitol,* 157 Wis.2d 298, 459 N.W.2d 581, 585 (App.1990), appropriating a competitor's trade secrets, *Culligan, Inc. v. Rheaume,* 268 Wis. 298, 67 N.W.2d 279, 283–84 (1954), and slander of business reputation, *id.* 67 N.W.2d at 283–84—is covered by the policy, the policy has a bulge not easy to make sense of or plausible to attribute to the deliberate choice of the parties. And even the "everything else" cases involve information, which the tort of intentional interference with contractual relations need not.

Fortunately, we do not have to determine the outer bounds of the term "unfair competition" as it appears in the insurance policy in order to decide this case. Curtis's complaint elaborates upon the claim of tortious interference with contractual relations in a way that preserves the informational connotations of the traditional legal concept of "unfair competition." The specific allegations of the complaint, recall, are that Orange Cross "disseminat[ed] false information about Curtis" and "campaign[ed] to get the public to call 911 and ask for Orange Cross." The first allegation is either a charge of defamation, in which event we would not even have to reach "unfair competition" in the list of covered offenses, or a charge of product disparagement, see *Restatement (Second) of Torts* § 623A, comment g, p. 341 (1977); *id.* § 626, and the latter characterization seems to us to nestle comfortably within a concept of unfair competition that is close to its original meaning of trademark infringement. The traditional trademark infringer gets sales unfairly from a competitor by leading consumers to think that the infringer's product or service is of higher quality than it is. The product disparager gets sales unfairly from a competitor by making the consuming public think that the competitor's product is of lower quality than the disparager's—implying, just as in the trademark case, that the disparager's product or service is of higher quality than it is.

Even closer to a traditional claim of trademark infringement is the allegation that Orange Cross (and the other defendants) tried to get the public to call 911 and ask for Orange Cross. Curtis was the 911 ambulance service. To tell people to call 911 and ask for Orange Cross was in effect to represent to them that Orange Cross was an authorized 911 ambulance service for the City of Sheboygan, when in fact only Curtis was. This was very close to an attempt to pass Orange Cross off as Curtis, the core trademark infringement. If 911 ambulance service = Curtis, and Orange Cross is telling people in effect that 911 ambulance service = Orange Cross, this is almost the same thing as telling people that Orange Cross is Curtis. It is not quite the same thing but it is close enough to count as unfair competition unless the latter term is to be frozen in legal history, which seems to us as implausible as supposing that it is a synonym for "antitrust violation."

■ First National argues that even if Curtis's complaint charges unfair competition within the meaning of the insurance policy, as we believe it does, coverage is barred by various exclusions. The district judge did not consider these alternative grounds for ruling that First National had no duty to defend Orange Cross against Curtis's suit. But they have not been waived and First National is therefore entitled to urge them on us as alternative grounds to the district judge's for upholding the judgment.

■ The policy excludes coverage for an "advertising injury arising out of the willful violation of a penal statute" by or with the consent of the insured. The antitrust laws contain penal provisions, but so do many other statutes not normally considered penal or criminal, such as the copyright laws, which contain criminal penalties although they are rarely imposed. Wisconsin imposes such penalties for conspiracy to inflict business injury, Wis.Stat. § 134.01, but the same conduct can give rise to a private action for unfair competition, Wis.Stat. § 100.20(5), so the insurer would be excused only from defending the criminal, not the civil, suit.

Perhaps, though, the emphasis in the exclusion belongs on the word "willful," so that

what is meant is that anyone who violates a statute in circumstances that would expose the violator to criminal punishment under the statute does forfeit coverage, contrary to our assumption in the preceding paragraph. But even if this were right it would be highly unlikely that Curtis's complaint should be understood to be charging Orange Cross with a crime. Almost all criminal prosecutions under the antitrust laws involve conspiracies to fix prices or allocate markets between competitors. (The *only* federal sentencing guideline for antitrust offenses is entitled "Bid–Rigging, Price–Fixing, or Market–Allocation Agreements Among Competitors." United States Sentencing Guideline § 2R1.1.) Price-fixing is among the many offenses charged in Curtis's lengthy complaint, but it would be a stretch to suppose that the complaint alleges criminal activity. And all this is on the dubious assumption that the advertising injury alleged in the tortious-interference count of Curtis's complaint should be classified as arising out of a willful violation of a penal statute rather than arising out of the tort of unfair competition.

■ Next, First National points to a provision in the insurance policy barring coverage when the advertising injury arises out of "the publication or utterance of defamatory or disparaging material concerning any person or organization or goods, products or services . . . made by or at the direction of the insured with knowledge of the falsity thereof." But Curtis's complaint does not allege, nor is it clear that Curtis would have to prove, that the defendants' alleged campaign of disseminating false information about Curtis was made with knowledge that the information was false. The defendants may have disseminated negative information that they believed was true. They might still be guilty of tortious interference with contractual relations, at least if they failed to exercise due care to make sure they were telling the truth about Curtis. Might; there are no pertinent cases in Wisconsin, and few elsewhere—and those few are divided over whether the tort requires knowledge of the falsity of the representations constituting the interference with the plaintiff's business. Compare *Delloma v. Consolidation Coal Co.,* 996 F.2d 168,

170–71 (7th Cir.1993), and cases cited there, holding that such knowledge is not required by Illinois law, with *Robert S. Weiss & Associates, Inc. v. Wiederlight,* 208 Conn. 525, 546 A.2d 216, 223 (1988), holding that it is required by Connecticut law. Since the issue is an open one in Wisconsin, we do not see how First National could avoid its duty to defend by claiming that Curtis will *have* to prove Orange Cross's knowledge of falsity, thus taking the case out of the policy.

Last, and closely related to the preceding point, there is a policy exclusion for "any injury arising out of any act committed by the insured with actual malice." We may assume, at least to begin with, that the reference is to the "actual malice" standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). A plaintiff who is a public figure cannot obtain a judgment for defamation unless he shows that the defendant either knew that the defamatory statement was false or was indifferent to whether it was true or false. Curtis is not a public figure, so it may not have to prove actual malice on the part of Orange Cross or the other defendants in order to recover for defamation, just as it may not have to prove knowledge of falsity in order to recover for tortious interference with contractual relations. It is not even clear that Curtis is charging defamation (not all false information about a company or its products is defamatory); and as long as it is charging something else, either instead of or as well as defamation, an exclusion applicable only to defamation would not excuse the insurance company from having to defend the suit.

Although the term "actual malice" is rarely encountered outside the field of defamation and invasion of privacy, rarely is not never. Nor is it clear that the term as used in the insurance policy in this case is meant to be limited to "malice" in the sense that it bears in *New York Times Co. v. Sullivan.* "Malice" is also used in business tort cases to denote intent to injure, *Maleki v. Fine–Lando Clinic Chartered, S.C.,* 154 Wis.2d 471, 453 N.W.2d 208, 211–12 (App.1990); *Restatement (Second) of Torts* § 766, comment s (1979), and used in that sense may be required for an award of punitive damages in

such cases. *Herrmeyer v. Kleeman,* 76 Wis.2d 410, 251 N.W.2d 445, 447–48 (1977). Inserting the term in an insurance policy exclusion might be a way of excluding coverage for punitive damages in personal injury cases. Cf. *School District of Shorewood v. Wausau Ins. Cos., supra,* 488 N.W.2d at 85 n. 2. We may go further and assume, again without having to decide, that the exclusion in the present policy is intended to get the insurance company off the hook whenever the insured is sued about a statement that the plaintiff must prove was made with actual malice in whatever senses that term bears in the law. But whether proof of actual malice in any of those senses is required in a case of tortious interference with contractual relations is too unclear to enable First National to avoid its duty to defend by pointing to the exclusion.

Since part at least of Curtis's suit alleges conduct within the scope of the insurance policy and none of the exclusions is applicable, First National violated its duty to defend and the judgment in its favor must therefore be reversed with directions to enter judgment for Orange Cross.

REVERSED.